Filed 11/8/24  P. v. Durden CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMEL DURDEN,<br><br>        Defendant and Appellant. | A165711<br><br>(Contra Costa County<br>Super. Ct. No. 05-201323-3) |

Following a jury trial, defendant Jamel Durden was convicted of attempting to evade a peace officer while driving recklessly (Veh. Code, § 2800.2).[1]  On appeal, he argues: (1) the trial court improperly admitted into evidence his pretrial statements that were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) the trial court erred in admitting evidence of his prior convictions for impeachment purposes; and (3) the cumulative effect of these alleged errors requires reversal.  We affirm.

## BACKGROUND

### The Charge

In October 2020, the Contra Costa County District Attorney filed an information charging defendant with one count of attempting to flee a peace

---

[1] Further undesignated statutory references are to the Vehicle Code.

1

officer while driving recklessly, in violation of section 2800.2. The information also alleged defendant had suffered a prior serious or violent felony conviction in 2009. (Pen. Code, §§ 667, subds. (d) & (e), 1170.12, subds. (b) & (c).)

**The Trial**

*Prosecution Case*

At 9:22 p.m. on September 5, 2020, Deputy Evan Cubit of the Contra Costa County Sheriff's Department was patrolling eastbound on State Route 4 with his partner, Deputy Maurice Lewis. They were both in uniform, and in a fully marked sheriff patrol vehicle. They then saw a Mercedes drive past them at approximately 85 miles per hour, 20 miles over the posted speed limit. Deputy Cubit activated his emergency lights on his patrol vehicle and began the process of a traffic stop.

The driver of the Mercedes—later identified as defendant—initially obeyed Deputy Cubit's directions and pulled over to the right shoulder. Deputy Lewis exited the patrol vehicle and approached the Mercedes for a traffic stop. A few seconds after Deputy Lewis reached the front passenger window and shined his flashlight into it, defendant accelerated and took off driving.

Deputy Lewis quickly returned to the patrol vehicle. Deputy Cubit, who still had the emergency lights on the patrol vehicle, activated his siren and pursued defendant. To catch up to defendant, Deputy Cubit had to drive approximately 110 miles per hour. Defendant swerved back and forth across the four lanes of traffic at least seven times, while Deputy Cubit pursued him at speeds between 110 and 120 miles per hour.

The chase continued for nearly five miles until defendant reached the Loveridge exit, which had an approximately 90-degree turn to it. As defendant was exiting, the lights on his vehicle were turned off. Because

2

defendant exited the off-ramp at about 90 miles per hour, he could not negotiate the 90-degree turn. He lost control of his car, sped through a red traffic light, and flew straight across the intersection and across a median, finally crashing into an iron fence. Deputy Cubit called an ambulance for defendant.

After the crash, Deputy Cubit parked his patrol vehicle, exited it, and saw defendant get out of his car, run away, and jump over the iron fence. Deputy Cubit pursued defendant on foot and managed to apprehend him.

Deputy Cubit testified that defendant committed at least four traffic violations during the pursuit. (See §§ 22349 [driving over maximum speed limit], 22107 [switching lanes without signaling], 24250 [turning vehicle lights off during darkness], 21453, subd. (a) [failing to stop at red light].)

Deputy Cubit handcuffed defendant and placed him in the back of the patrol vehicle. Deputy Cubit interviewed defendant, who stated he fled because he had a warrant out of Los Angeles County and did not want to go to jail. The conversation lasted about five minutes.

### Defense Case

Defendant testified he grew up in the Alemany Housing Projects in San Francisco. He witnessed a lot of violence, including police violence. Defendant saw the police regularly harass people. Defendant was arrested at least three times as a teenager. During those arrests, he was "roughed up" by police.

Defendant admitted that on September 5, 2020, he was driving his Mercedes over the posted speed limit. Defendant saw the red and blue lights coming from the patrol vehicle behind him and pulled over. But defendant did not put his car in park; instead, he kept his foot on the brake while Deputy Lewis walked over. When Deputy Lewis approached the front passenger side of the car, defendant hit the gas pedal because he was

3

"nervous" and "scared" that he "could possibly be the next person harmed by the police." Defendant testified that "[i]t was just impulse" that led him to pull back into traffic. However, he testified that when he pressed on the gas pedal he knew what he was doing "[t]o a certain extent."

After defendant drove off from the officers, he knew he was passing all the other traffic around him for approximately five miles. He also admitted that he repeatedly weaved in and out of the lanes of traffic at high speeds. Defendant testified, "I wanted to get away from the deputies" and "I was trying to get away."

Defendant admitted that when he took the Loveridge exit, he turned off his vehicle's lights because he wanted to lose the deputies behind him. Defendant saw the red traffic light in front of him but that he "was going too fast to try to stop at a red light." Instead of stopping at the red light, defendant tried to make a right turn. He lost control of his vehicle, went over the center median, and crashed into a fence.

Defendant got out of his car and looked around for a good place to hop the fence. He then hopped the fence and ran away. About 30 seconds later, one of the deputies caught him.

Defendant said that he spoke to Deputy Cubit while in the back of the patrol vehicle, but denied telling Deputy Cubit why he had fled.

### Rebuttal

Deputy Cubit testified that defendant was cooperative after being placed in handcuffs. Before taking defendant's statement in the patrol vehicle, Deputy Cubit read defendant his *Miranda* rights and asked him if he understood each of the rights, to which defendant replied, "yes."

While giving his statement, defendant appeared emotional but "spoke very concise, very clear," and "was very articulate in his answers to the questions that [Deputy Cubit] was asking." Deputy Cubit did not threaten

4

defendant, and he did not have his weapon out.

Deputy Cubit reiterated that defendant told him that he fled because he had a warrant for his arrest. Defendant also mentioned having a few drinks earlier in the day. Defendant further stated that he could have killed somebody during the incident. He was extremely apologetic.

**The Verdict and Sentence**

On October 26, 2021, the jury returned a guilty verdict on the sole charged count of attempting to evade a peace officer while driving recklessly. Following a bifurcated trial the next day, the jury found true the special allegation that defendant had been convicted of a prior serious or violent felony.

On February 25, 2022, the trial court sentenced defendant to four years in state prison.

This appeal followed.[2]

## DISCUSSION

### Admission of Defendant's Pretrial Statements

Defendant argues the trial court erred in admitting his pretrial statements to law enforcement because he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights before making the statements. We disagree.

#### *Additional Background*

Citing *Miranda,* defendant filed a motion in limine to exclude evidence of his statements to Deputy Cubit on September 5, 2020. On day three of

---

[2] Defendant did not file his notice of appeal within the 60-day deadline to appeal (see Cal. Rules of Court, rule 8.308(a)), but this court deemed the notice timely filed on February 28, 2022 under the doctrine of constructive filing.

5

trial, the trial court held a hearing under Evidence Code section 402 to determine the admissibility of the statements.

During that hearing, Deputy Cubit testified that on September 5, 2020, after defendant crashed his vehicle into a fence, he attempted to flee on foot. Deputy Cubit pursued defendant and tased him two times. Defendant was apprehended, handcuffed, and placed into the back of Deputy Cubit's patrol vehicle.

Deputy Cubit advised defendant of his *Miranda* rights by reading off a department-issued card that listed those rights. After advising defendant of each of the *Miranda* rights, Deputy Cubit asked defendant, " 'Do you understand this right?' " and defendant replied, " 'yes.' " Based on Deputy Cubit's observations, defendant appeared to understand the rights of which he was advised.

Defendant then proceeded to answer Deputy Cubit's questions about the incident. During the interview, defendant did not appear to be visibly in pain. He also spoke coherently. Defendant did not request a lawyer or say that he did not want to talk to Deputy Cubit at any point.

After the interview, Deputy Cubit asked defendant if he was in pain, and defendant replied that his foot hurt. Defendant was not limping. It turned out that defendant sustained a chip fracture to his foot, as well as a small puncture underneath his arm from the dart of the taser. Defendant was taken to the hospital after the interview.

Deputy Cubit did not record his interview with defendant. Deputy Cubit was not issued a body-worn camera or dash cam. Although he had a department-issued smart phone, he had never used it for recording statements, and was unsure if it had the capability to do so.

Following this testimony and arguments of counsel, the trial court

6

ruled on the motion in limine as follows:

"[T]he statement was taken on September 5th by Deputy Evan Cubit in the back of a patrol car, while the defendant was in handcuffs. He was advised of his *Miranda* rights from a department-issued card. Read them verbatim from that card. And then he affirmatively understood each of those rights. And, thereafter, began speaking with Deputy Cubit.

"At no point did the defendant ask for a lawyer or ask to terminate the discussion. And no statements were elicited by Deputy Cubit before the defendant was provided his *Miranda* rights. During the ensuing discussion, the defendant was speaking coherently. And based upon the opinion of Deputy Cubit, he appeared to understand his rights.

"The statement that was thereafter elicited, although not in the record, was not recorded. Deputy Cubit does not have a department-issued recording device, nor does he wear a body worn camera. After the statements were elicited, the defendant was taken to the hospital after a crash.

"The Court can infer that as a result of the crash, the defendant had an injury to his foot. And as the deputy testified, had been indeed tased two times. At the time of the discussion or interview, the defendant did not appear to be in visible pain, although he did state afterwards that his foot hurt, although, he was not limping.

"The defendant also had one small puncture wound from a TASER dart under his arm after being tased by Deputy Cubit. That was all done prior to the arrest, and prior to the interview that the Court has noted.

"Deputy Cubit later learned that the defendant had sustained a chip fracture to his foot. Although the defendant did not request any medical attention before Deputy Cubit interviewed him.

"So, those will be the Court's findings of fact. And as I noted

7

previously, *Miranda* rights would be required under those circumstances. The question becomes whether or not the defendant's waiver of those rights was knowing, intelligent, and voluntary.

"The Court finds, based upon the totality of the circumstances in this case, that the defendant adequately understood his rights. And, thereafter, by responding to questions from Deputy Cubit, voluntarily answered questions . . . from the deputy . . . .

"So, on that record, the Court will find that the waiver was knowing, voluntary, and that the subsequent statements were also, indeed, voluntary. And the Court will deny motion in limine number 8 at this time."

As mentioned, later at trial Deputy Cubit testified that defendant stated he fled because he had a warrant for his arrest and did not want to go to jail. Defendant also mentioned he had a few drinks earlier in the day.

### *The Law*

The Fifth Amendment to the United States Constitution guarantees that a suspect in a criminal case "may not be compelled to be a witness against himself in any respect." (*Colorado v. Spring* (1987) 479 U.S. 564, 574.) To implement this "prohibition against compelled self-incrimination" (*People v. Mickey* (1991) 54 Cal.3d 612, 647), the United States Supreme Court in *Miranda* devised the following "prophylactic" rule (*Michigan v. Tucker* (1974) 417 U.S. 433, 446): "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda, supra,* 384 U.S. at p. 444.)

A defendant may waive his or her rights under *Miranda*, provided law enforcement "obtain[s] a waiver that is knowing, voluntary, and intelligent. (*Miranda, supra,* 384 U.S. at pp. 444, 478–479.)" (*People v. Molano* (2019) 7

8

Cal.5th 620, 648 (*Molano*).) This inquiry has two dimensions. " 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*Ibid*.) " 'Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' [Citation.] The prosecution must demonstrate the validity of a suspect's waiver by a preponderance of the evidence." (*Molano*, *supra*, 7 Cal.5th at p. 648.)

We have held that " '[i]n reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from the undisputed facts and facts found by the trial court whether the challenged statement was legally obtained.' " (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1211 (*Vance*).)

### *The Trial Court Did Not Err in Denying Defendant's Motion In Limine To Exclude His Statements on* Miranda *Grounds*

We first address defendant's claim that he did not voluntarily waive his *Miranda* rights. " 'A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " [Citation.] The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed". . . . In determining whether or not the accused's will was overborne, " 'an examination must be made of "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." ' " ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346–347.)

9

Substantial evidence supports the trial court's finding that under the totality of the circumstances, defendant voluntarily waived his *Miranda* rights. That evidence is supplied by Deputy Cubit's testimony that when defendant was read his *Miranda* rights, he verbally affirmed that he understood, and by all indications appeared to understand, those rights. Defendant did not appear to be visibly in pain. And he was not limping. Defendant did not mention his foot hurt until after the interview, when Deputy Cubit asked him whether he was in pain. Defendant also did not mention any pain he felt from being tased; he did not mention the taser at all. There was no indication he asked for medical attention before or during the interview. Further, at no point did he state he wished to stop speaking to Deputy Cubit. Nor did he ask for a lawyer. Additionally, there was no evidence that Deputy Cubit threatened or pressured defendant to elicit his statements. On top of all that, defendant spoke coherently when being *Mirandized* and gave a detailed statement of what happened during the incident.

The trial court could and did reasonably conclude under the totality of the circumstances that defendant voluntarily waived his *Miranda* rights. There is no evidence that any pain or injuries defendant had experienced from the use of the taser or his foot fracture had affected his ability to understand what he was doing or had "overborne" his will. (*People v. McWhorter, supra*, 47 Cal.4th at pp. 346–347.) Rather, the record supports the inference that defendant freely made the rational choice to offer his side of the events to Deputy Cubit.

Defendant nonetheless argues he did not voluntarily waive his *Miranda* rights. He notes that before waiving his *Miranda* rights, he injured his foot, was tased twice, was handcuffed, and was then placed in a patrol

10

vehicle. He argues "[h]e was suffering its traumatic physiological and emotional impacts" from being stunned by a taser. Defendant then acknowledges that "[t]he trial court credited Deputy Cubit's testimony that [defendant] was not in visible pain." However, defendant contends "this finding is contrary" to several federal cases primarily in the Fourth Amendment context that have described the painful effects inflicted by a taser. Defendant maintains that "[b]ased on the timing and sequence of the events, the taser attacks were a motivating cause of [his] decision to talk to Deputy Cubit after being advised of his *Miranda* rights."

Defendant is essentially challenging the credibility of Deputy Cubit's testimony described above. Defendant misunderstands our role in conducting substantial evidence review. The credibility determination was resolved against defendant and we are not entitled to second-guess it. (See *Vance, supra*, 188 Cal.App.4th at p. 1211.)

Further, the trial court's conclusion that the evidence was sufficient to show defendant voluntarily waived his *Miranda* rights does not run afoul of the federal cases he cites. None of the cited cases involved a claim of a *Miranda* violation—much less support the proposition suggested by defendant that the discharge of a taser gun, without more, prevents a defendant from voluntarily waiving his or her *Miranda* rights.

More on point are the cases from other jurisdictions that are cited by the People. Those cases held that the use of taser did not invalidate a *Miranda* waiver where such use was not shown to diminish the defendant's capacity to understand and appreciate the consequences of waiving his or her *Miranda* rights. (See, e.g., *United States v. Patterson* (M.D.Florida, June 22, 2009, Case No. 3:09-cr-7(S1)-J-32TEM) 2009 WL 10670083 at *6 [rejecting the defendant's argument that "the Taser discharge and his alleged

11

intoxication interfered with his mental capacity to appreciate the consequences of waving his [*Miranda*] rights"]; *United States v. Mack* (M.D.La. Mar. 6, 2009, Case No. 07-238) 2009 WL 580430 at *2–3 [*Miranda* waiver was voluntary where the defendant was tased three times, but the record showed he could understand and comply with commands and understood his rights]; *Davis v. State* (Nev.App. 2020) 474 P.3d 848 [2020 WL 6197302 at *3] [*Miranda* waiver voluntary where defendant had been tased, suffered smoke inhalation, and had a head injury because the injuries "were not shown to have affected her ability to understand what she was doing."].) Likewise here.

Accordingly, the trial court's conclusion that defendant voluntarily waived his *Miranda* rights is legally sound and supported by the record.

We next address defendant's argument that he did not knowingly and intelligently waive his *Miranda* rights.[3] Defendant acknowledges "the trial court credited Cubit's testimony that [defendant] spoke coherently and appeared to understand his rights." However, defendant asserts "this finding conflicts with scientific research," namely a study that he claims shows "a taser attack adversely affects cognitive abilities." And here, defendant contends he "was cognitively impaired when advised of his rights." Defendant thus maintains he "lacked the full capacity of knowingly, intelligently, and impliedly waiving his rights by speaking to the deputy."

Defendant's challenge is, once again, nothing more than a request for us to reweigh the evidence and make credibility findings. We decline the invitation. The trial court was entitled to, and did, credit Deputy Cubit's

---

[3] The People argue defendant forfeited this contention by not raising it in the trial court. We need not decide the issue because assuming the claim was not forfeited, we conclude it lacks merit.

testimony that defendant verbally affirmed he understood his *Miranda* rights after being advised of them, appeared to understand and appreciate his rights, spoke cogently and coherently, and did not appear to be in pain. This testimony supplies substantial evidence to support the finding that defendant knowingly and intelligently waived his *Miranda* rights.

In sum, the trial court properly denied defendant's motion in limine to exclude his statements to Deputy Cubit.

### *Any Error In Admitting Defendant's Statements Was Harmless*

Assuming the trial court erred in admitting defendant's statements, we agree with the People that any error was harmless beyond a reasonable doubt, because independent evidence overwhelmingly supports the guilty verdict. (See *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1166 ["We review *Miranda* error under the 'harmless beyond a reasonable doubt' standard propounded in *Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)]."])

A conviction for the sole charged crime of evading a peace officer while driving recklessly (§ 2800.2) requires proof of the following elements: (1) a peace officer in a car was pursuing defendant; (2) defendant, who was also in a car, willfully fled from, or tried to elude the officer, with the intent to evade; (3) defendant either: (a) drove with willful or wanton disregard for the safety or persons or property, or (b) committed at least three traffic violations during the pursuit; and (4) specific requirements identifying the peace officer as law enforcement are met. (CALCRIM No. 2181; § 2800.2, subds. (a)–(b).)[4]

---

[4] Section 2800.2 states in relevant part: "(a) If a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be

Defendant argues that "the sole issue at trial was whether [he] acted willfully" as stated in element two.[5] As the jury was instructed, "Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain an advantage." (CALCRIM No. 2181; accord, Black's Law. Dict. (12th ed. 2024) p. 1922, col. 1 ["The word 'wilful' or 'wilfully' when used in the definition of a crime, it has been said time and again, means only intentionally or purposely as distinguished from accidentally or negligently and does not require any actual impropriety . . . ."].)

The defense theory at trial was that defendant did not "willfully" evade the deputies, but instead acted "impuls[ively]" out of his fear of police. Defendant gave testimony in support of this theory. According to defendant, to rebut this theory, the prosecution "relied entirely on Cubit's testimony about [defendant's] custodial admissions." Defendant then asserts the question of willfulness presented a "close" question because it " 'hinged on a credibility contest' between the defense theory and prosecutor's theory and the credibility of Deputy Cubit and [defendant]." And since the case was close, defendant maintains that any error in admitting his statements into

---

punished by imprisonment in the state prison, or by confinement in the county jail for not less than six months not more than one year. The court may also impose a fine . . . or may impose both that imprisonment or confinement and fine. [¶] (b) For purposes of this section, a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs."

[5] Defendant apparently did not argue the People failed to prove the *other* elements of a section 2800.2 offense beyond a reasonable doubt.

14

evidence was not harmless. We are unconvinced.

Contrary to defendant's assertion, the evidence supporting defendant's guilt was not "close," but was strong in many respects. Initially, we disagree with defendant's argument that the prosecution relied exclusively on evidence of his confessions to prove that he willfully fled the deputies. The prosecution also relied on other circumstantial evidence, much of which was undisputed.

That evidence overwhelmingly supported a finding that defendant intentionally drove in a manner to evade the deputies pursuing him: defendant stepped on his gas pedal and drove off after being pulled over; led the deputies on a high-speed chase for nearly five miles, ignoring sirens and flashing lights of the patrol car; repeatedly weaved through lanes of traffic at high speeds; exited an off-ramp with a 90-degree turn at approximately 90 miles per hour; turned off his car lights while doing so; drove through a red light and across a center median; and crashed his car into a fence before running away from the deputies and jumping over the fence.

Although the defense argued defendant did not act "willfully" because he had acted out of "impulse" and "fear" of police, his subjective fear was not a defense to the crime of evading a police officer, as the prosecutor pointed out in closing argument. Such evidence may have showed defendant's alleged *motive* for fleeing, but it did not tend to negate evidence that he intentionally and purposely drove in a reckless manner to evade the deputies. The trial court's comments during a discussion with counsel outside the jury's presence aptly articulate why. For example, the court recounted defendant's testimony that he drove off from the deputies after being pulled over and that he "was just thinking about getting away at the moment." The court then observed: "Implicit in [defendant's] answer is a deliberation and thinking, a

15

degree of willfulness, an acting with a purpose.  Granted, he is certainly contending that [he] acted out of fear.  But that question and answer evinced to this Court that there was sufficient deliberation based on the defendant's statement of willfulness, in that he acted willingly and on purpose, albeit, out of fear."

The following testimony during defendant's cross-examination further illustrated the trial court's point:

"Q.    Mr. Durden, you said you didn't intentionally pull back into traffic, right?

"A.    Correct.

"Q.    It was your foot that hit the gas pedal, right?

"A.    Correct.

"Q.    You knew that you were hitting the gas pedal, right?

"A.    Correct.

"Q.    You knew when you hit the gas pedal, your car goes forward?

"A.    Correct.

"Q.    Right.  And . . . I believe you said, and correct me if I'm wrong, that you did all of those things because you were afraid?

"A.    Correct.

"Q.    And you knew what you were doing when you pressed the gas pedal?

"A.    To a certain extent, sure."

In sum, regardless of defendant's alleged fear, and disregarding evidence of defendant's statements to Deputy Cubit, the record contains overwhelming evidence that defendant intentionally drove in a reckless manner to evade the deputies.  Accordingly, any error in admitting defendant's pretrial statements into evidence was harmless beyond a

16

reasonable doubt.

### Admission of Defendant's Prior Convictions

Defendant next argues the trial court erred in admitting evidence of his prior convictions for driving on a suspended, revoked, or invalid license.

#### *Additional Background*

During direct examination by his attorney, defendant testified as follows:

"Q. Now, I want to ask you about some things that happened in your past. You had an issue when you were about 21 years old, in where you -- that resulted in you getting convicted of a robbery; is that right?

"A. Yes.

"Q. And then . . . [¶] . . . [i]n 2018, you had an incident that led to you getting a misdemeanor case for a car burglary, right?

"A. Yes.

"Q. Now . . . have you done anything to try to change your life since . . . let's talk about, first, that robbery incident?

"[PROSECUTOR]: Objection. Relevance.

"THE COURT: Sustained.

"BY [DEFENSE COUNSEL]:

"Q. . . . [A]re you still the same person who got that robbery conviction?

"[PROSECUTOR]: Objection. Relevance.

"THE COURT: Let's talk at side-bar.

"{Side-bar conference out of the presence of the jury.}

"THE COURT: Objection sustained. But you can rephrase . . . . [¶] . . . [¶]

"BY [DEFENSE COUNSEL]:

"Q. So, you got those cases when you were younger, right?

17

"A.    Yes.

"Q.    And are you the same person as you were back then, or are you are you a different person now?  Live a different life now?

"A.    I'm a way better person than I was back then."

Outside the jury's presence, the parties discussed the above testimony. To impeach defendant's testimony "about his character since 2013," the People asked to introduce evidence of defendant's three prior convictions for driving on a suspended, revoked, or invalid license (§ 14601.1) in 2014, 2018, and 2019.  The People asserted defendant's testimony "opened the door" to evidence of the section 14601.1 convictions.

The trial court stated the "question is whether the jury is left with the false impression that the defendant's a way better person now than he was then, and implying there has been no other run-ins with the law.  And the fact of three other misdemeanor convictions in the record from 2014, 2018, and 2019, counsel differently."  Thus, over defense counsel's objections, the court allowed "the People to probe and ask briefly on cross, based upon the defendant opening the door to the existence of [the] three convictions."

During cross-examination, the prosecutor covered the events of September 5, 2020 and then asked defendant whether that date was the first time he had driven without a valid driver's license.  Defense counsel objected and following a sidebar conference, the prosecutor asked defendant:  "Sir, you've been convicted of three misdemeanor driving on a suspended, revoked, or invalid license since 2014, right?"  Defendant responded, "Yes."

### Any Error In Admitting Evidence of the Prior Convictions Was Harmless

Relying primarily on Evidence Code section 780, subdivision (i), defendant argues the trial court erred in permitting the prosecution to offer rebuttal evidence of his three prior section 14601.1 convictions to counter his

18

testimony. We conclude that any error was harmless.

Evidence relating to the credibility of a witness is relevant. (Evid. Code, § 210.) Evidence Code section 780 provides in pertinent part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (i) The existence or nonexistence of any fact testified to by him . . . ." Thus, "a witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony." (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946; see *People v. Lang* (1989) 49 Cal.3d 991, 1017 ["[e]vidence tending to contradict any part of a witness's testimony is relevant for purposes of impeachment"], abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

According to defendant, he did not open the door to evidence that he had been convicted of driving on a suspended, revoked, or invalid license in 2014, 2018, and 2019 (§ 14601.1). As noted, the trial court admitted this evidence, reasoning that defendant's testimony left the jury with the false impression "that he's been completely law abiding *since 2013*" when he was convicted of robbery. (Italics added.) Defendant, however, argues that he never testified he was a "way better person" at the time of trial than he was "since 2013." He says that he instead testified that he was "a way better person" since the 2013 robbery conviction *and* the 2018 burglary conviction. Defendant contends that "because [he] never claimed to have been licensed or completely law abiding since 2013, the impeachment evidence did not contradict any false testimony."

19

The People have a different interpretation of defendant's testimony. They note that the jury heard trial counsel ask defendant: "[A]re you still the same person who got that robbery conviction?" Following a relevance objection and a sidebar conference, trial counsel then asked: "So, you got those cases when you were younger, right?" Defendant confirmed and then trial counsel asked: "And are you the same person as you were back then, or are you . . . a different person now? Live a different life now?" Defendant then responded, "I'm a way better person than I was back then."

The People argue, "[t]his full colloquy opened the door to impeachment via [defendant's] prior misdemeanor convictions." The People then assert: "While it is true that in the second iteration of the question, trial counsel referenced 'those cases,' rather than just the robbery conviction as in the original question, the premise of the question only makes sense if it was aimed at the 2013 robbery conviction given trial counsel's reference to [defendant] having been 'younger' at the time at which the question was aimed. And while of course [defendant] was 'younger' in 2018 than he was in 2020 when he committed the instant offense, that small difference in time is not a reasonable basis for the question that trial counsel actually asked. If that were insufficient, [defendant's] response made absolutely clear that he was referencing his 2013 conviction in his own testimony; he explicitly claimed that he was now 'a way better person than [he] was back then.' [Defendant's] reference to 'back then,' again only makes sense in connection with the 2013 robbery conviction, not the 2018 burglary conviction given the proximity in time between the latter prior conviction and the offense for which he was then on trial."

The parties' competing arguments highlight that due to defense counsel's questioning, there is some ambiguity in defendant's testimony as to:

20

(a) what time frame defendant was referring to when using the phrase "back then"; (b) whether he thus " ' "paint[ed] an overall picture" that he had been completely law abiding since 2013' "; and (c) whether the defense consequently opened the door to evidence that he had been convicted of section 14601.1 offenses in 2014, 2018, and 2019.

We need not resolve this question. Even assuming the trial court erred in admitting the impeachment evidence, any error would be harmless under any standard.[6]

As the People point out, the reference to defendant's section 14601.1 convictions was limited to a single question at trial. The prosecutor asked defendant to confirm the fact of those convictions, without asking him any details about them. The prosecutor did not mention this evidence ever again to the jury. Thus, the record shows that the reference to the prior convictions represented a very small fraction of the entire trial. Moreover, as discussed above, there was independent, overwhelming evidence of defendant's guilt. Given these circumstances, we conclude that a more favorable result would not have been reached absent the purported evidentiary error.

---

[6] Defendant argues we should assess prejudice under the *Chapman* standard applicable to federal constitutional error, rather than the reasonable probability standard in *People v. Watson* 46 Cal.2d 818, 836 (*Watson*) applicable to state law error, because the admission of the evidence violated his due process right. Defendant's constitutional claim is forfeited because he did not raise it in the trial court. (See *D.Z. v. L.B.* (2022) 79 Cal.App.5th 625, 632, citing *People v. Partida* (2005) 37 Cal.4th 428, 436; *People v. Cardona* (2009) 177 Cal.App.4th 516, 523.) In any event, we conclude the error was harmless under either the *Chapman* or *Watson* standard.

**Claim of Cumulative Error**

Finally, defendant contends that even if the individual errors at trial do not require reversal, the cumulative effect of the errors deprived him of a fair trial. We disagree. Because we have found either no error or harmless error, "[w]e find no reversible error by considering the claims cumulatively." (*People v. Scott* (2015) 61 Cal.4th 363, 408.)

## DISPOSITION

The judgment is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P.J.

_____

MILLER, J.

(*People v. Durden* A165711)